FILED

05/07/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0427

DA 22-0427

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 98

MISSOULA COUNTY,

       Plaintiff and Appellant,

     v.

STATE OF MONTANA; MONTANA
DEPARTMENT OF CORRECTIONS;
and BRIAN GOOTKIN, in his official
capacity as the Director of the Montana
Department of Corrections,

       Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the First Judicial District,<br>In and For the County of Lewis and Clark, Cause No. ADV-2020-588<br>Honorable Mike Menahan, Presiding Judge |

COUNSEL OF RECORD:

       For Appellant:

          Brian J. West, Civil Deputy County Attorney, Missoula, Montana

       For Appellees:

          Colleen E. Ambrose, Montana Department of Corrections, Helena,
          Montana

Submitted on Briefs: October 18, 2023

Decided: May 7, 2024

Filed:

_____
                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Missoula County (the County) appeals a June 7, 2022 Order from the First Judicial District Court, Lewis and Clark County, granting summary judgment to the Montana Department of Corrections (DOC) on the County's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

¶2 We affirm and restate the issues as follows:

1. *Whether the District Court correctly concluded the County's contract claims were time-barred by § 18-1-402, MCA.*

2. *Whether the District Court correctly concluded the County's tort claim for breach of the covenant of good faith was not supported by a special relationship.*

3. *Whether the District Court correctly concluded that the County could not recover under a theory of unjust enrichment.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The DOC houses inmates under its jurisdiction within county detention centers located throughout Montana. Upon a court's oral pronouncement of a defendant's sentence, the DOC assumes responsibility for the costs of confinement. The DOC must pay the costs of holding inmates in local facilities "at a rate that is agreed upon by the arresting agency and the detention center that covers the reasonable costs of confinement, excluding capital constructions costs." Section 7-32-2242(2)(a), MCA (2019).

¶4 In 2012, the DOC, in consultation with the Montana Association of Counties, the Montana Sheriffs and Peace Officers Association, the Montana Highway Patrol, and individual county commissioners, developed a Per Diem Rate Calculation Worksheet. Counties holding DOC inmates utilized the Worksheet to provide information regarding

2

their confinement costs so that reasonable reimbursement rates could be negotiated between the counties and the DOC.

¶5 Missoula County and the DOC entered into a County Detention Center Reimbursement Agreement on January 23, 2015, which set a reimbursement rate of $88.73 per day for each inmate. The initial term of the contract ended on January 31, 2016, but was renewed for an additional two years, which would expire on January 31, 2018.

¶6 Around the same time the 2015 Agreement was being executed, the Montana Legislature undertook consideration of the reimbursement payment for DOC inmates held in county jails and detention centers. The Office of Budget Planning and Programming and the Legislative Services Division requested information from the DOC on its practices and payments. In April 2015, an amendment was made to House Bill 2 (HB 2), the general appropriations bill, which capped the reimbursement rate to be paid to local facilities.[1] The Legislature also adopted a statement of intent in HB 2 declaring its intention to pay no more than $69 per day per inmate in any county detention center for the 2017 biennium. Consequently, on June 1, 2015, the Administrator of the DOC's Business Management Services Division notified Missoula County Sheriff T.J. McDermott by letter that the reimbursement rate for DOC inmates would be capped at $69, beginning on July 1, 2015, which DOC paid to Missoula County throughout the 2017 biennium.

---

[1] While not relevant to our consideration of the issues raised here, the cap was apparently adopted in response to a perception that counties were using State funds to service construction debt.

¶7      While preparing its proposed 2019 biennium budget, the DOC used the $69 rate when calculating its projected county jail reimbursement costs.  According to the DOC, it did not explicitly request for continuance of the cap, but merely used that rate to prepare a budget estimate.  The 2017 Legislature received testimony from county sheriffs, commissioners, and associations opposing a continuance of the $69 rate cap for the 2019 biennium, but nonetheless decided to maintain the cap and focus instead on reducing the number of DOC inmates housed in county facilities to help counties reduce jail costs.

¶8      By March 2018, the DOC had paid the County for all jail holding costs incurred through January 2018, when the parties' contract had expired.  On April 23, 2020, the County filed this suit, seeking a declaratory judgment that the "reasonable costs of confinement" that must be paid by DOC under § 7-32-2242(2)(a), MCA (2019),[2] in accordance with the 2012 Per Diem Rate Calculation Worksheet, exceeded the $69 cap, and claiming breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.  After both parties moved for summary judgment, the District Court entered an order granting summary judgment to the DOC on all the remaining counts and denying the County's claims.

¶9      The County appeals.

---

[2] The Legislature modified the language of § 7-32-2242(2)(a), MCA, in 2023, replacing "reasonable costs of confinement, excluding capital construction costs . . . ." with "actual costs of holding [an inmate] in confinement."  *See* 2023 Mont. Laws ch. 584, § 1.  However, this dispute arose under the 2019 version of the statute.

**STANDARD OF REVIEW**

¶10 We review a district court's grant or denial of summary judgment *de novo*, following the criteria set forth in M. R. Civ. P. 56. *Dick Anderson Constr., Inc. v. Monroe Prop. Co.,* 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257. Summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3).

¶11 We review a district court's application of statutes of limitations for correctness. *Grant Creek Heights, Inc. v. Missoula Cnty.,* 2012 MT 177, ¶ 13, 366 Mont. 44, 285 P.3d 1046 (citing *Johnson v. Dist. VII, Human Res. Dev. Council,* 2009 MT 86, ¶ 18, 349 Mont. 529, 204 P.3d 714).

¶12 In reviewing a good faith and fair dealing claim, this Court considers whether the party moving for summary judgment has presented substantial evidence to support the requisite "special relationship" to pursue such an action. *Story v. Bozeman,* 242 Mont. 436, 451, 791 P.2d 767, 776 (1990). Regarding claims of unjust enrichment, we review a district court's factual findings for clear error and conclusions of law for correctness. *See Mont. Digital, LLC v. Trinity Lutheran Church,* 2020 MT 250, ¶ 9, 401 Mont. 482, 473 P.3d 1009.

**DISCUSSION**

¶13 *1. Whether the District Court correctly concluded that the County's contract claims were time-barred by § 18-1-402, MCA.*

¶14 The County argues the District Court erred by concluding that its contract claims against the DOC were time-barred by the one-year statute of limitations contained in

5

§ 18-1-402, MCA. The County contends the one-year limitation in Title 18 applies only to procurement contracts governed by Title 18, not to the Title 7 Interlocal Agreement at issue here, and therefore, the eight-year contract limitation period under § 27-2-202(1), MCA, should apply. The County argues that, at a minimum, there exists a dispute over which limitation period applies and therefore this Court should conclude the longer period applies. *See Blanton v. Dep't of Pub. HHS*, 2011 MT 110, ¶ 33, 360 Mont. 396, 255 P.3d 1229 ("[W]hen there is substantial question as to which of several statutes should apply, the longest limitations period control.").

¶15 "The starting point for a question of statutory interpretation is the plain language of the statute itself." *Smith v. Burlington N. & Santa Fe Ry.*, 2008 MT 225, ¶ 22, 344 Mont. 278, 187 P.3d 639. "Statutory construction is a 'holistic endeavor' and must account for the statute's text, language, structure, and object." *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, 90 P.3d 426 (citation omitted). "A whole act must be read together and where possible, full effect will be given to all statutes involved." *Delaney & Co. v. City of Bozeman*, 2009 MT 441, ¶ 22, 354 Mont. 181, 222 P.3d 618.

¶16 Chapter 1 of Title 18, in which § 18-1-402, MCA, is contained, is entitled "Public Contracts Generally." Then, § 18-1-401, MCA, entitled "Jurisdiction," provides broadly that "[t]he district courts of the state of Montana shall have exclusive original jurisdiction to hear, determine, and render judgment *on any claim or dispute arising out of any express contract* entered into with the state of Montana or an agency, board, or officer thereof." Section 18-1-401, MCA (emphasis added). The following section, 18-1-402(2), MCA,

states, "in a case in which a settlement procedure is not provided by the contracting agency, the action must be commenced within 1 year after the cause of action has arisen."

¶17     In contradiction to the County's argument, the plain text of these provisions, as well as their "language, structure, and object," *Heath*, ¶ 24, do not limit their application to procurement contracts, but rather are applicable to state contracts generally.  While the County correctly notes that Title 18 also addresses contracts that are "characterized by their procurement requirements," this does not preclude application to a broader category of contracts consistent with the text quoted above.  Indeed, we previously applied this section to a non-procurement contract in a case involving a school's alleged failure to renew a coach's contract, explaining:

> The State of Montana is subject to suit in district court "on any claim or dispute arising out of any express contract" with the State or a state entity or officer.  Section 18-1-401, MCA . . . .  A plaintiff must file suit within one year after a final administrative decision or, if the contract provides no settlement procedure, within one year after the claim accrues.  *See* § 18-1-402, MCA.

*Plakorus v. Univ. of Mont.*, 2020 MT 312, ¶ 13, 402 Mont. 263, 477 P.3d 311.

¶18     While the subject contract is a Title 7 interlocal agreement, Title 7 provides no separate statute of limitations, and the County provides no statutory basis to establish that DOC is not a "contracting agency" under § 18-1-402, MCA, or that interlocal agreements are excluded from the scope of the language in § 18-1-401, MCA ("any claim or dispute arising out of any express contract").  Accordingly, we conclude the District Court did not err by holding the County's contract claims were barred by the one-year limitation in

§ 18-1-402(2), MCA.[3] Having so concluded, we need not further explore the Legislature's role in appropriating or limiting funds that may be expended for State contracts.

¶19 *2. Whether the District Court correctly concluded the County's tort claim for breach of the implied covenant of good faith and fair dealing was not supported by a special relationship.*

¶20 The County argues it presented sufficient evidence to establish a "special relationship" to support its claim for breach of the covenant of good faith and fair dealing, noting the parties were in unequal bargaining positions because of the nature of the DOC's relationship with the Legislature. The County argues the DOC failed to act in good faith by requesting less money than it had contracted to pay under its contract with the County and by advocating for rate caps in the face of its obligation to pay "reasonable costs" under

---

[3] Justice McKinnon's Dissent proffers that the eight-year statute of limitations in § 27-2-202(1), MCA, should control, reasoning that the preference for resolving doubt among competing, generally applicable statutes of limitations should be resolved in favor of the longest one. Dissent, ¶ 50. However, § 18-1-402(2), MCA, is not merely one of several "competing" statutory provisions that could apply, because there is not a "substantial question" about its applicability, given its clear text. *See Blanton*, ¶ 33. By its plain language, the Title 18 provision is the specific and exclusive statute enacted to apply to public contracts, granting jurisdiction over "any claim or dispute arising out of *any express contract entered into with the state of Montana or an agency*, board, or officer thereof." Section 18-1-401, MCA (emphasis added). The one-year limitation period provided by § 18-1-402(2), MCA, was made applicable to contracts that involve state entities when a settlement procedure has not otherwise been contracted for by the parties, as here (". . . the action must be commenced within 1 year after the cause of action has arisen."). The Dissent's utilization of § 27-2-202(1), MCA, requires rejection of the Title 18 provision for purposes of an agreement arising out of Title 7, but there is nothing in the text that limits its application to only procurement contracts. This accords with our application of the provision in a non-procurement case four years ago, as noted above. *See Plakorus*, ¶ 28. It is certainly the Legislature's prerogative to enact legislation specifically applicable to state contracts, including limitation periods, or to alter our prior holding if it believes we applied the statute in error, but those issues remain with the Legislature. Here, we are faced with a statute that plainly encompasses the state contract dispute at hand.

8

Montana law. It thus contends the District Court erred in rejecting its claim for breach of the covenant.

¶21 "The conduct required by the implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Section 28-1-211, MCA. Thus, "the covenant is a mutual promise implied in every contract that the parties deal with each other in good faith, and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." *Phelps v. Frampton*, 2007 MT 263, ¶ 29, 339 Mont. 330, 170 P.3d 474 (citing *Beaverhead Bar Supply v. Harrington*, 247 Mont. 117, 805 P.2d 560 (1991)). "Although 'every contract, regardless of type, contains an implied covenant of good faith and fair dealing,' a breach of that covenant is generally only 'a breach of the contract,'" and, accordingly, "in ordinary contract cases, only contract damages are recoverable." *Warrington v. Great Falls Clinic, LLP*, 2019 MT 111, ¶ 14, 395 Mont. 432, 443 P.3d 369 (citing *Story*, 242 Mont. at 450, 791 P.2d at 775). "However, we have previously recognized an 'exceptional circumstance' when tort damages can be recovered 'in contracts involving special relationships which are not otherwise controlled by specific statutory provisions.'" *Warrington*, ¶ 14 (citation omitted).

¶22 A special relationship can be found when all five elements of the inquiry are met:

> (1) the contract must be such that the parties are in inherently unequal bargaining positions; and (2) the motivation for entering the contract must be a non-profit motivation, i.e., to secure peace of mind, security, future protection; and (3) ordinary contract damages are not adequate because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party "whole"; and (4) one

9

party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability.

*Story*, 242 Mont. at 451, 791 P.2d at 776. On a motion for summary judgment, "[i]f substantial evidence is presented supporting each and all of the above essential elements and such evidence is controverted in whole or in part, there arises appropriate questions of material fact to be submitted to a jury. If substantial evidence is not presented in support of each and all of the essential elements, the court shall direct there is no special relationship." *Story*, 242 Mont. at 451, 791 P.2d at 776.

¶23     We found a special relationship based upon inherently unequal bargaining positions and contract party vulnerability in *Stephens v. Safeco Insurance Company of America,* 258 Mont. 142, 852 P.2d 565 (1993). There, the contract at issue was between an insurance provider and its insured. *Stephens*, 258 Mont. at 143-44, 852 P.2d at 566. We reasoned that significant disparities often exist in the insurance context because the insured typically "has no voice in the preparation of the policy" and often "may be in dire financial straits" and therefore is "especially vulnerable to oppressive tactics . . . ." *Stephens*, 258 Mont. at 146, 852 P.2d at 568 (citing *First Sec. Bank v. Goddard*, 181 Mont. 407, 419, 593 P.2d 1040, 1047 (1979), where a special relationship in the same context was likewise found). In contrast, in the context of an employment relationship, we concluded in *Warrington* that no special relationship existed where the plaintiff-employee was not foreclosed from other employment options, but rather had extensive experience "in the healthcare industry [that] made her employable elsewhere," and indeed had found other employment within ten days

after the defendant-clinic breached the employment contract. *Warrington*, ¶ 17. Thus, the plaintiff's employment was not dependent upon terms the "defendant dictated." *Warrington*, ¶ 17.

¶24 These cases do not provide support for finding a special relationship in this case. While the County's argument stresses the closeness of the relationship between the DOC and the Legislature, the focus here must be the nature of these parties as public bodies and the legal framework within which they operate. "A county is the largest political division of the state having corporate power." Section 7-1-2101(1), MCA. "Every county is a body politic and corporate and as such has the power specified in this code or in special statutes and such powers as are necessarily implied from those expressed." Section 7-1-2101(2), MCA. Specifically, "[a] county has the power to . . . make contracts," § 7-1-2103(3), MCA, and here the parties did so, negotiating a contract between them while respectively represented by counsel. The County and the DOC are both well-versed in how inter-governmental contracts are secured and funded.

¶25 The statutory framework for this particular contract underscores the parties' respective powers with regard to the subject dispute. A county's consent is required to house state inmates in its facility. *See* § 7-32-2242(1), MCA (2019) ("Local government, state, and federal law enforcement and correctional agencies may use any detention center for the confinement of arrested persons and the punishment of offenders, under conditions imposed by law *and with the consent of the governing body responsible for the detention center*.") (emphasis added). Section 7-32-2242(2)(a), MCA (2019), helps to shield

11

counties from below-cost reimbursements by requiring they be paid "the reasonable costs of confinement" by the DOC. As a practical matter, these provisions ensure that each party will "act in a reasonable manner in its performance" with regard to the County's confinement costs. *Story*, 242 Mont. at 450, 791 P.2d at 775.

¶26 Regarding the legislative process, the Legislature clearly sets agency budgets and appropriates funds, not the DOC. Department employees responded to legislative inquiries made in the course of the State budget processes, as they are required to do. *See* § 17-7-132, MCA (requiring agency representatives to appear and be heard regarding a request for state money). Counties are likewise well aware of the legislative process and may lobby and participate therein, as they often do. Testimony from county officials was given to the Legislature on the issue of reimbursement rates.

¶27 Even if the parties could be said to be on unequal footing, the County did not demonstrate that contract damages would be insufficient to remedy its claimed losses in this dispute between government entities. As we have said, obtaining tort damages for bad faith breach of contract requires "exceptional circumstances." *Ammondson v. Nw. Corp.*, 2009 MT 331, ¶ 66, 353 Mont. 28, 220 P.3d 1. A payment disagreement between government agencies is hardly exceptional. The County also asserts that non-pecuniary interests in community safety and inmate wellbeing were impaired, but we are not persuaded from the record that substantial evidence demonstrates such harm is reasonably certain to occur—a requirement in proving future damages. *See* § 27-1-203, MCA; *Elk*

12

*Mt. Motor Sports, Inc. v. Mont. Dep't of Labor & Indus.*, 2012 MT 261, ¶ 45, 367 Mont. 36, 289 P.3d 165.

¶28 For the above-stated reasons, we conclude that a "special relationship" for this purpose between the County and the DOC was not established, and the District Court did not err by so ruling.

¶29 *3. Whether the District Court correctly concluded that the County could not recover under a theory of unjust enrichment.*

¶30 The County's final claim against the DOC is for unjust enrichment. The District Court denied this claim, reasoning that unjust enrichment could not be used to "regain the position [the County] lost through delaying filing its contract claim." Nor did the District Court allow for recovery after the contract officially expired, concluding that the County voluntarily agreed to accept inmates at reimbursement rates offered by DOC that it later claimed were unfair. Regarding timeliness, the County argues the District Court erred because unjust enrichment is subject to a three-year statute of limitations and not incorporated into the one-year limit imposed by the District Court.

¶31 "Unjust enrichment is an equitable claim for restitution to prevent or remedy inequitable gain by another." *Mont. Dig., LLC*, ¶ 10 (quoting *Associated Mgmt. Servs. v. Ruff*, 2018 MT 182, ¶ 64, 392 Mont. 139, 424 P.3d 571). To prevail on a claim of unjust enrichment, the aggrieved party must establish that (1) a benefit was conferred upon the recipient by the claimant; (2) the recipient knew about or appreciated the benefit; and (3) the recipient accepted or retained the benefit under circumstances rendering it inequitable for the recipient to do so. *Ruff*, ¶ 65. However, the equitable remedy of unjust

13

enrichment is generally only available when an adequate legal remedy does not exist. *See Mt. Water Co. v. Mont. Dep't of Revenue*, 2020 MT 194, ¶ 17, 400 Mont. 484, 469 P.3d 136 (explaining that unjust enrichment is "often available to ameliorate the harsh effects of law and to provide a remedy where a legal remedy is non-existent or inadequate."). This is because a "valid contract defines the obligation of the parties as to matters within its scope, displacing any inquiry into unjust enrichment." *Ruff*, ¶ 67. Thus, "unjust enrichment applies in the contract context only when a party renders 'a valuable performance' or confers a benefit upon another under a contract that is invalid, voidable, 'or otherwise ineffective to regulate the parties' obligations.'" *Ruff*, ¶ 67 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. c (2011)).

¶32 We conclude that unjust enrichment was not demonstrated here. As the District Court noted, the contract between the County and the DOC was valid, and "[b]ut for Missoula County's failure to timely file, it could have recovered under that contract for DOC's breach." The County had knowledge of the breach for several years but did not attempt to pursue claims pursuant to the contractual terms it now claims were coerced or otherwise wrongfully altered. We conclude, as the District Court did, that a valid contract existed and that equitable remedies cannot "backfill" the County's failure to timely pursue its claims. Regarding relief for unjust enrichment after the expiration of the contract, we conclude the District Court properly reasoned that, after the expiration of the contract term, the County continued its previous course of conduct to accept inmates at the reimbursement rates offered by DOC, without objection, and that the County did not demonstrate its rate

14

dispute with the DOC resulted in the Department reaping an "inequitable gain." *Mont. Dig., LLC*, ¶ 10.

¶33 Justice Shea's Dissent offers a case in favor of the County's unjust enrichment claim for this post-contract time period. As an equitable remedy, unjust enrichment is fact-dependent, applicable when there has been retention of a benefit "under such circumstances that would make it inequitable" for the receiving party to retain it, and thus, it is a claim readily subject to fair argument about those particular circumstances. *N. Cheyenne Tribe v. Roman Catholic Church*, 2013 MT 24, ¶ 39, 368 Mont. 330, 296 P.3d 450. Under the circumstances here, we conclude an inequity supporting an unjust enrichment claim did not occur.

¶34 First, as noted above, the County is a government entity with various powers, including the power to determine whether to house state inmates in its facility. Section 7-32-2242(1), MCA. DOC, also a government entity, could not force the County to house its inmates; the County's consent was required. The County was thus empowered under the governing statutes to refuse to house state inmates at the lower price. To be fair, we recognize the reality that the County and the DOC must cooperate to provide effective care and management of inmates, and it would be difficult, as a practical matter, for the County to suddenly refuse to receive and house inmates after sentencing. However, the facts here are that the County, despite having a contract providing a higher rate, accepted payment at the rate authorized by the Legislature and paid by DOC without contesting the issue, and did so, not just for the several months of the post-contract period covered by the unjust

enrichment claim, but for years. Indeed, the County did not initiate legal action for almost five years after DOC began paying the legislatively set rates. The County thus bears some responsibility for whatever benefit inured to the DOC over that period, during the entirety of which the County was empowered to decline to provide services at the lower rate.

¶35 Second, while it could be said that DOC and the State reaped a benefit in the sense that it received inmate services at a lower rate, it is also clear that DOC did not receive or retain a monetary benefit that could be saved or expended elsewhere. When the Legislature capped DOC's authority to pay counties at the lower rate, it reduced DOC's appropriation accordingly. DOC, as a department of the State, neither had more authority nor more money to pay the County for housing state inmates. Thus, no money was retained in DOC's pocket as savings—DOC was never given additional funds by the Legislature in the first place—and any such funds were expended elsewhere, a function of the appropriation process under which DOC must operate.

¶36 Third, while the parties set a higher rate in their contract negotiations, that does not compel the conclusion that any rate lower than the negotiated rate is per se unreasonable, particularly in light of post-negotiation legislative action that enacted, after study and deliberation, a uniform rate to be applied to all counties. While the County can claim entitlement under § 7-32-2242(2)(a), MCA (2019), to payment of the "reasonable costs of confinement," the question that follows is whether the Legislature has the power, by subsequent enactment, to legislatively determine what amount constitutes "reasonable cost" on a statewide basis. We need not resolve here the legal issues inherent in that inquiry

16

to recognize that the parties' status as entities which operate within a government financial structure weighs against the notion that one agency can claim unjust enrichment by the other because it was shortchanged in a transaction; that outcome is not rare. And it deserves repeating that the County had the power to decline the transaction altogether.

¶37 Related, as noted above, the Legislature has modified § 7-32-2242(2)(a), MCA, replacing "reasonable costs of confinement, excluding capital construction costs," with "actual costs of holding [an inmate] in confinement," effective July 1, 2023. Therein, the Legislature also defined "actual costs" as "the greater of":

(i)   the daily per inmate provider rate for crossroads correctional facility less 10%; or

(ii)  $82.

Section 7-32-2242(2)(e), MCA (2023). Consequently, after July 1, 2023, the daily rate will be calculated by reference to the rate paid to the Crossroads Correctional facility, and be either 10% less than that rate, or $82, whichever is greater. Thus, the rate the County here seeks on the basis of unjust enrichment bears little or no relation to the rate that has already been determined to be the "actual costs" for payment of inmate costs going forward—indeed, the $88.73 the County claims may well be higher than that future rate. Therefore, granting the County's unjust enrichment claim here could well entitle every county to the same relief, both now and going forward.

¶38 Of course, the 2023 amendments to the statute do not govern here, and, likewise, none of these reasons are necessarily dispositive individually. However, when we consider

17

them together, for purposes of equity, we conclude that any perceived unfairness here does not support a viable claim of unjust enrichment.

¶39 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

Justice James Jeremiah Shea concurring in part and dissenting in part.

¶40 I concur with the Court's resolution of Issue 2. I join Justice McKinnon's dissenting Opinion as to Issue 1. As for Issue 3, I dissent from the Court's conclusion that, specifically as it pertained to the County's claim for unjust enrichment after the expiration of the contract term, DOC was entitled to summary judgment because "the County continued its previous course of conduct to accept inmates at the reimbursement rates offered by DOC." Opinion, ¶ 32.

¶41 "[U]njust enrichment applies in the contract context only when a party renders 'a valuable performance' or confers a benefit upon another under a contract that is invalid, voidable, 'or otherwise ineffective to regulate the parties' obligations.'" *Ruff*, ¶ 67 (citation omitted). As it pertains to the period of time that the contract was in effect, I agree with the Court's reasoning that unjust enrichment does not apply. Opinion, ¶ 32. But since the contract expired on January 31, 2018, the State has continued to reap the windfall of

18

housing DOC inmates at county detention facilities at an amount that is indisputably less than a reasonable rate. This is, in a word, "inequitable."

¶42 "Unjust enrichment is an equitable claim for restitution to prevent or remedy inequitable gain by another." *Mont. Dig., LLC*, ¶ 10 (citing *Ruff*, ¶ 64). The party making a claim for unjust enrichment must establish: (1) a benefit conferred upon another; (2) an appreciation or knowledge of the party receiving the benefit; and (3) the acceptance or retention of the benefit by the party receiving the benefit under circumstances that would make it inequitable for the party to retain the benefit without payment of its value. *N. Cheyenne Tribe*, ¶ 39 (citations omitted). The party claiming unjust enrichment does not need to establish any wrongdoing on the part of the party receiving the benefit. *N. Cheyenne Tribe*, ¶ 39 (citation omitted). "Unjust enrichment does not necessarily require demonstrating misconduct or bad faith on behalf of the recipient." *Mont. Dig., LLC*, ¶ 10 (citations omitted). A party claiming unjust enrichment "need not necessarily have been deprived of something in order to recover." *Mont. Dig., LLC*, ¶ 10 (quoting *N. Cheyenne Tribe*, ¶ 38).

¶43 The Court rejects the County's claim for unjust enrichment after the expiration of the contract, holding: "Regarding relief for unjust enrichment after the expiration of the contract, we conclude the District Court properly reasoned that, after the expiration of the contract term, the County continued its previous course of conduct to accept inmates at the reimbursement rates offered by DOC, without objection, and that the County did not demonstrate its rate dispute with the DOC resulted in the Department reaping 'an

19

inequitable gain.'" Opinion, ¶ 32. A substantive application of the elements of unjust enrichment establishes that the County was entitled to summary judgment on its unjust enrichment claim relative to the period of time after expiration of the contract.

**(1) Missoula County conferred a benefit upon DOC.**

¶44 DOC agreed that the reasonable reimbursement rate to the County for housing DOC inmates was $88.73 per day for each inmate. This was not an arbitrary number pulled from thin air. As the Court noted, this rate was arrived at after an extensive process in which DOC consulted with the Montana Association of Counties, the Montana Sheriffs and Peace Officers Association, the Montana Highway Patrol, and individual county commissioners to develop a Per Diem Rate Calculation Worksheet which was utilized "so that reasonable reimbursement rates could be negotiated between the counties and the DOC." Opinion, ¶ 4. After agreeing on a reasonable rate for housing DOC inmates, DOC began paying roughly three-quarters of that reasonable rate after the legislature capped payments at $69. DOC has never disputed the appropriateness and reasonableness of the rate it arrived at and agreed to with the County.[1]

---

[1] While acknowledging that it is not attempting to resolve the question, the Court speculates as to "whether the Legislature has the power, by subsequent enactment, to legislatively determine what amount constitutes 'reasonable cost' on a statewide basis" for unjust enrichment purposes. Opinion, ¶¶ 36-38. Even though it is only dicta, it should be pointed out that the Court's suggestion includes two fundamental infirmities. First, the Court characterizes the County's claims as "one agency . . . claim[ing] unjust enrichment by the other." Opinion, ¶ 36. If Missoula County was just another State "agency" the Court's analysis might hold water. But a county is a distinct political entity with a distinct tax base. This is the very crux of this dispute—county taxpayers paying the cost of a State expenditure. Second, the Court suggests that "for purposes of equity" the Legislature can determine "actual costs" for housing a State inmate based on a formula that has nothing to do with the *actual* "actual costs" incurred by a specific county. Opinion, ¶¶ 37-38.

20

**(2) DOC's appreciation and knowledge of the benefit received.**

¶45    For the same reason that the first element is satisfied, this element cannot be disputed.  DOC was aware of and agreed to the appropriate and reasonable rate to which Missoula County was entitled for housing State inmates.  It was likewise aware that it was paying substantially less than the rate it agreed was reasonable.

**(3) DOC's acceptance and retention of the benefit under circumstances that would make it inequitable for it to retain the benefit without payment of the benefit's value.**

¶46    There is no dispute that the DOC inmates that Missoula County continues to house are DOC's exclusive financial responsibility.  There likewise can be no dispute that DOC is reaping a windfall by paying substantially less than what it agreed was the reasonable fee for housing its inmates.  Neither the District Court, nor this Court have attempted to set forth any circumstances that would equitably allow DOC to retain this windfall.

¶47    Section 7-32-2242(2)(a), MCA (2019), requires that the costs of holding DOC inmates in county detention facilities "must be paid" by DOC at a rate that covers the reasonable costs of confinement.  DOC and Missoula County arrived at a figure pursuant to § 7-32-2242, MCA.  For over six years, since the expiration of Missoula County's contract with DOC, DOC has failed to pay that mandatory cost.[2]  The reasons for DOC's

---

Unjust enrichment is an equitable remedy that is fact-dependent.  Missoula County and DOC used the worksheet that had been developed to determine a reasonable reimbursement rate *specific* to Missoula County.  The Legislature's abstract determination of "actual costs" for purposes of setting a statewide price point may be relevant for contracting purposes, but it has no relevance in an unjust enrichment inquiry.

[2] Relevant to this point, the cost arrived at and agreed to in 2015 has no doubt increased appreciably in the past six years.

failure to pay are irrelevant to the determination that it has been unjustly enriched. The doctrine of unjust enrichment is not a penalty for malfeasance. *Mont. Dig., LLC*, ¶ 10. It is simply an equitable remedy employed when a party has failed to pay its own freight. I struggle to think of a circumstance that better fits the elements of unjust enrichment.

¶48 The entire basis for the District Court's rejection of the County's unjust enrichment claim for the period beyond the expiration of the contract was because the County was not required to accept State inmates. The Court endorses this notion, noting several times that the County "accept[ed] inmates at the reimbursement rates offered by DOC," Opinion, ¶ 32, "[t]he County was . . . empowered under the governing statutes to refuse to house state inmates at the lower price," Opinion, ¶ 34, and "it deserves repeating that the County had the power to decline the transaction altogether." Opinion, ¶ 36. But in most instances, state inmates are already in county custody when they become state inmates upon a court's oral pronouncement of a defendant's sentence. As it pertains to a claim for unjust enrichment in the absence of a contract, then, it seems the lesson county governments must take away from the Court's Opinion is that they must immediately withdraw any consent pursuant to § 7-32-2242(1), MCA, to house state inmates or else the taxpayers of their respective counties will continue to foot the bill for the excess costs that the State refuses to pay. And then what?

¶49 This Court previously addressed a Cascade County District Court's orders directing DOC to transport several defendants from the Cascade County Detention Center (CCDC) within seven days, or else the Cascade County Sheriff would transport the defendants to

22

either the Montana State Prison or the Montana Women's Prison. *Guyer v. Mont. Eighth Judicial Dist. Court*, No. OP 20-0233, 400 Mont. 562, 465 P.3d 1164, 2020 Mont. LEXIS 1933 (June 30, 2020). The Cascade County Attorney sought the orders because CCDC was overcrowded and over capacity, and because DOC's reimbursement rate, combined with DOC's "laggard approach to placing defendants," was costing Cascade County taxpayers thousands of dollars per year. Although we vacated the District Court's orders in that case, our decision was expressly predicated on the Governor's Directive in effect at the time restricting transportation of inmates due to COVID-19. *Guyer*, 2020 Mont. LEXIS 1933, * 7. We held:

> At the present time, transportation of inmates is restricted under the Directive. DOC has since resumed transports. Considering the number of inmates statewide who may be subject to a transfer order at any given time and the protocols in place to minimize the threat of COVID-19 within the correctional system, this Court declines to dictate the speed at which such transports must occur in a particular case.

*Guyer*, 2020 Mont. LEXIS 1933, *7. That was then. But what could be the possible reason for rejecting a similar order now? Since counties are "empowered . . . to refuse to house state inmates" at an inadequate price, Opinion, ¶ 34, the Court's Opinion in this case provides them with the very basis for seeking just such an order. Unless county officials are content to allow their taxpayers to continue picking up part of the tab for what everyone agrees is the State's responsibility, I suspect we will have the opportunity to consider this issue before long.

/S/ JAMES JEREMIAH SHEA

23

Justices Laurie McKinnon and Ingrid Gustafson join in the concurring and dissenting Opinion of Justice James Jeremiah Shea.

/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON

Justice Laurie McKinnon, dissenting.

¶50 I dissent from the Court's conclusion that § 18-1-402, MCA, sets forth the applicable statute of limitations and bars Missoula County's contract claims. The 2015 Interlocal Agreement[1] between Missoula County and the Department—two government entities—was established through the Interlocal Cooperation Act, Title 7, Chapter 11, Part 1, and not pursuant to Title 18, which is devoted to regulation of state procurement, bidding, and public works contracts. Based on the County's Complaint, there is a substantial question as to which of several statutes of limitations apply, thus making applicable the general rule that doubt should be resolved in favor of applying the longest statute of limitations. *Johnson Farms, Inc v. Halland*, 2012 MT 215, ¶ 26, 366 Mont. 299, 291 P.3d 1096.

¶51 We have held that courts must look to the "gravamen of the action" when determining which statute of limitations applies. *Tin Cup Cty Water and/or Sewer Dist. v. Garden City, et al.*, 2008 MT 434, ¶ 25, 347 Mont. 468, 200 P.3d 60. "The choice of which statute of limitations to apply ultimately rests on a characterization of the essence of the

---

[1] The term of the 2015 Interlocal Agreement ended on January 31, 2016, but provided for automatic renewal under the same terms for a period of two years.

claim." *Thiel v. Taurus Drilling*, 218 Mont. 201, 210, 710 P.2d 33, 38 (1985). There is no dispute that the 2015 Interlocal Agreement between the County and Department was a Title 7 agreement for holding prison inmates pursuant to §§ 7-11-104 and 7-32-2242, MCA. Section 7-11-104, MCA, provides: "One or more public agencies may contract with any one or more other public agencies to perform any administrative service, activity, or undertaking or to participate in the provision or maintenance of any public infrastructure facility, project, or service . . . ." A "public agency" is "any political subdivision, including municipalities, counties, school districts, and any agency or department of the state of Montana." Section 7-11-103, MCA. The "purpose of [an interlocal agreement is] to permit *local* governmental units to make the most efficient use of their powers by enabling them to cooperate with other local governmental units on a basis of mutual advantage and thereby to provide services and facilities in a manner . . . that will accord best with . . . factors influencing the needs and development of *local* communities." Section 7-11-102, MCA (emphasis added). The initial agreement between the County and Department, which remained in effect through subsequent amendments, stated the purpose of the agreement was to "benefit . . . the public, the County, and the Department" and was premised upon providing the public with cost efficient correctional services, providing inmates with proper care, and complying with other requirements for correctional facilities. Section 7-32-2242, MCA (2021), in particular, provides:

> (1) Local government, state, and federal law enforcement and correctional agencies may use any detention center for the confinement of arrested persons and the punishment of offenders, under conditions imposed by

law and with the consent of the governing body responsible for the detention center.

(2) (a) [I]f a person is confined in a detention center by an arresting agency not responsible for the operation of the detention center, the costs of holding the person in confinement must be paid by the arresting agency at a rate that is agreed upon by the arresting agency and the detention center and that covers the reasonable costs of confinement, excluding capital costs . . . .

¶52    In the County's Complaint, it avers the Department is obligated by law (§ 7-32-2242(2)(a), MCA) and contract (2015 Interlocal Agreement) to reasonably compensate the County for inmates held within county facilities so that county residents do not unfairly bear the financial burden of housing inmates which, by law, they are not responsible for.[2]  The County alleged a violation of § 7-32-2242(2)(a), MCA, in that the Department was not paying the reasonable costs of confinement.  The County also alleged a violation of § 53-30-504, MCA, which provides authority for the Department to enter interlocal agreements pursuant to § 7-11-105, MCA.  The County alleged a violation of subsection (4) of § 53-30-504, MCA, which provides: "[t]he department may not enter into a contract unless the department . . . has the legal authority and the ability to finance its share of the costs under the contract."  Section 53-30-504(4), MCA.  Furthermore, the County alleged that the Department, which promulgated Mont. Admin. R. 20.28.119 entitled "Calculation of a Per Diem Rate—General Principles," violated its own rule by refusing to pay the County its actual costs based on the Per Diem Worksheet required by Mont. Admin. R. 20.28.119.  In its Complaint, the County requests a declaratory judgment

---

[2] See §7-32-2242 (2)(b), MCA.

26

that the reasonable costs of confinement in § 7-32-2242(2)(a), MCA, includes, at a minimum, the Actual County Detention Day Per Diem Rate, and that Mont. Admin. R. 20.28.119 requires the Department to pay the County its actual costs. The County also alleges breaches of contract, breaches of the covenant of good faith and fair dealing,[3] and unjust enrichment.

¶53 The Court concludes that the one-year statute of limitations in § 18-1-402, MCA, applies to bar the County's claim. While touting that statutory construction is a holistic endeavor and that a whole act must be read together to give all sections and statutes full effect, Opinion ¶ 15, the Court incorrectly determines, for the first time in our precedent, that a Title 7 interlocal agreement for holding prisoners is automatically, without any analysis of the basis of the Complaint, subject to Title 18 procurement provisions. Before addressing the Court's mechanical application of § 18-1-402, MCA, in contravention of its claim that it does so holistically, it is necessary to turn to the overwhelming amount of precedent which indeed recognizes that several statutes of limitations may apply in any given case. Further, the Court's simplistic "one shoe fits all" approach fails to adequately examine the basis of the County's claims.

---

[3] The Complaint does not aver whether the breach of the covenant of good faith and fair dealing is based in contract or tort. A claim for breach of the covenant of good faith and fair dealing may sound in tort or in contract, and the action remains subject to the statute of limitations for the applicable theory. *Northern Montana Hospital v. Knight*, 248 Mont. 310, 811 P.2d 1276, 1278-79 (1991). However, on appeal, the County argues the breach was based in tort, asserting a special relationship and that damages beyond contract damages are necessary.

¶54    In *Thiel*, we were asked to decide what statute of limitations applies for violations of the Securities Act of Montana.  218 Mont. at 204, 710 P.2d at 35.  As with Title 7 interlocal agreements, no specific limitation was set forth in the Montana Securities Act. *Thiel*, 218 Mont. at 205, 710 P.2d at 35.  The plaintiffs contended the eight-year statute of limitations found at § 27-2-202(1), MCA, applied, which pertained to written contracts. *Thiel*, 218 Mont. at 204, 710 P.2d at 35.  The defendants contended that the two-year statute of limitations found at § 27-2-211(1), MCA, applied, which pertained to "liabilities created by statute."  *Thiel*, 218 Mont. at 204, 710 P.2d at 35.  We concluded that the plaintiff's complaint could be interpreted as sounding in contract, tort, and statutory violations.  *Thiel*, 218 Mont. at 212, 710 P.2d at 39.  We then held:

> Where there is a substantial question as to which of two or more statutes of limitations should apply, the general rule is that the doubt should be resolved in favor of the statute containing the longest limitation.  Where doubt exists as to the nature of the action, courts lean towards application of the longer period of limitations.
>
> .    .    .
>
> This [general rule] serves the legislative intent of protecting defendants from stale claims, yet provides an approach of liberality which affords a plaintiff party-litigant maximum free access to our court system.  Although statutes of limitation[s] are primarily designed to assure fairness to defendants because they prevent claims from being brought when relevant evidence is so old that it is unreliable, the policy of repose is outweighed when the interests of justice require otherwise.

*Thiel*, 218 Mont. at 212-13, 710 P.2d at 40.  Accordingly, we held in *Thiel* that the eight-year statute of limitations applied, noting that it was for the legislature to decide otherwise, should it choose to do so.  *Thiel*, 218 Mont. at 213, 710 P.2d at 40.

28

¶55 Following *Thiel*, this Court decided *Ritland v. Rowe*, 260 Mont. 453, 861 P.2d 175 (1993), concluding that two statutes of limitation were applicable and were in conflict: § 27-2-207, MCA, which is the two-year limitation applied to injuries to property, and § 27-2-204(1), MCA, which is the three-year limitation for tort actions. 260 Mont. at 455-56, 861 P.2d at 176-77. We held that § 27-2-207, MCA, was not a more specific statute of limitations which would override § 27-2-204(1) and looked to the basis of plaintiff's claim. *Ritland*, 260 Mont. at 458, 861 P.2d at 178. We concluded that the injury to the plaintiff's property resounded in negligence and that the statutes were in conflict. *Ritland*, 260 Mont. at 458, 861 P.2d at 178. Relying on the general rule of *Thiel*, we resolved any doubt in favor of applying the longer limitation, concluding that such a result furthered the "public policy recognized in *Thiel* which affords 'a plaintiff party-litigant maximum free access to our court system.'" *Ritland*, 260 Mont. at 458, 861 P.2d at 178, quoting *Thiel*, 218 Mont. at 212, 710 P.2d at 40.

¶56 In *Kearney v. KXLF Communications*, 263 Mont. 407, 869 P.2d 772 (1994), we concluded the district court did not err in applying a five-year statute of limitations to Kearney's overtime compensation claim. 263 Mont. at 413, 869 P.2d at 775. We rejected KXLF's contention that § 27-2-211(1)(c), MCA, applied, which establishes a two-year statute of limitation for commencing actions when liability is created by statute. *Kearney*, 263 Mont. at 413, 869 P.2d at 775. We determined the resolution required us to reconcile inconsistent statutes of limitations, both of which had application to the situation, and that the conflict should be resolved in favor of Kearney being allowed to file his claim.

29

*Kearney*, 263 Mont. at 413, 869 P.2d at 775. In *Blanton v. Dep't of Pub. HHS*, 2011 MT 110, 360 Mont. 396, 255 P.3d 1229, we explained that a court must look to the substance of the complaint to determine the nature of the action and which limitation statute applies. *Blanton*, ¶ 32. After noting that potentially three different statutes of limitations applied, we concluded that since no specific statute of limitations provided for the relief plaintiffs sought, the "catch-all" five-year statute of limitations period in § 27-2-231, MCA, applied. *Blanton*, ¶ 33.

¶57 Here, the County alleges the Department violated the interlocal agreement, which is a breach of contract founded upon a writing and, under § 27-2-202(1), MCA, has an 8-year period of limitations. However, the County also alleges the Department violated § 7-32-2242(2)(a), MCA, which requires it to pay the reasonable costs of confinement for inmates housed by the County. The applicable period of limitation for an action to enforce a statutory liability is two years pursuant to § 27-2-211, MCA. Finally, § 27-2-231, MCA, provides that "[a]n action for relief not otherwise provided for must be commenced within 5 years after the cause of action accrues." As Title 7, upon which the interlocal agreement here is based, does not contain a specific period of limitation, § 27-2-231, MCA, would apply and the period of limitations would be five years. As in *Thiel* and its progeny, however, because several inconsistent statutes apply and are in conflict, the County is entitled to the longer period of limitations, which would be eight years. After examining the substance of the County's Complaint, there can be little doubt there is a "substantial question" as to which statute of limitations applies. *Johnson Farms, Inc.,*¶ 26.

30

¶58     Section 18-1-402, MCA, in contrast, is a statute of limitations for actions contained within a Title devoted to the regulation of procurements, bidding, and public works contracts. Any attempt by the Court to apply the one-year limitation in § 18-1-402, MCA, for contract disputes involving the State, would misinterpret the mutual purpose of the interlocal agreement and apply the statute out of context. Instead, § 18-1-402, MCA, concerns only contracts between a public agency and a private organization, such as construction contractors. Title 18's chapters govern, for example, construction contracts, the leasing of state buildings, and state-tribal cooperative agreements. It establishes the Montana Procurement Act and regulates the sale of State property, among other similar subjects. Chapter 1 concerns competitive bidding procedures, including regulation of bidding preferences for public contracts awarded for "the purchase of goods and for construction, repair, and public works of all kinds". Title 18, Ch. 1, Pt. 1, MCA; § 18-1-102(1), MCA. It establishes bid security requirements for the public authorities that solicit bids for public works projects. Title 18, Ch.1, Pt. 2, MCA. It establishes the procedures private entities awarded public contracts are to use when they seek prepayment of a portion of the funds they are due. Title 18, Ch. 1, Pt. 3, MCA. Hence, the weight of Title 18 addresses itself to the regulation of contracts for public works with private entities and has nothing to do with interlocal agreements entered into pursuant to Title 7 between two government entities with the purpose of housing inmates.

¶58     We have applied § 18-1-402, MCA, in only a few cases. In *Lutey Constr.-The Craftsman v. State*, 257 Mont. 387, 392, 851 P.2d 1037, 1040 (1993), we applied it to a

contract dispute between the State and a private construction company contracted to renovate the Yellowstone River Trout Hatchery. In *Zook Bros. Constr. Co. v. State*, 171 Mont. 64, 556 P.2d 911 (1976), we similarly applied it in a dispute between a private construction company and the Montana Department of Highways.

¶59 Justice Rice, in a dissenting opinion, appears to have articulated expressly this understanding of Title 18's purpose. In his dissent in *McDaniel v. State*, 2009 MT 159, 350 Mont. 422, 208 P.3d 817, involving § 18-1-404(1), MCA, a statute not at issue in this case, Justice Rice described Title 18's purpose as regulating "resident bidders and nonresident bidders, contracts for goods, and construction, repair and public works, hiring preferences, bid security, contracting entities, advertisement for bids, forfeiture of contracts, prepayment of public contractors, and such like." *McDaniel*, ¶ 65. Justice Rice noted that Title 18 had "nothing to do" with the underlying dispute in *McDaniel*, which involved the Department of Corrections, violations of a written probation conditions agreement, and a criminal supervised releasee. *McDaniel*, ¶ 65. Justice Rice noted that the statute should not be applied in a vacuum. *McDaniel*, ¶ 65.

¶60 I do not agree that § 18-1-402, MCA, governs *all* contract actions against the state, as the Court holds. In *Plakorus*, the Court mechanically applied the statute, as it does here, completely lacking any analysis of the nuances relative to the type of action alleged. *Plakorus*, ¶ 13. While a one-year period of limitations may be plausible in a procurement dispute involving a public contract, the same cannot be said for all contract claims against the state. This Court's precedent, when determining the applicable period of limitations,

does not focus on who the party is without any analysis of the underlying facts and the cause of action alleged. The Court's position gives the state a clear and unwarranted advantage in its dealings with other entities in *every* circumstance where there is a writing—which likely would be every contract because the state is not likely to enter an oral contract. I am not convinced this was the legislature's intent; rather, I think it is clear the legislature intended to cabin the one-year limitation period to Title 18 procurement disputes when it placed the repose period specifically within Title 18 with no reference or indication that it applied to anything but procurement contracts.

¶61   Here, the purpose of the 2015 Interlocal Agreement was to enable the County and the Department to cooperate to provide services and a facility for a specified inmate population. The Complaint alleges that residents of Missoula County are being forced to financially bear the cost of prisoner confinement in contravention to its contract agreement and the law. The purpose of an interlocal agreement is to provide facilities and services in a manner that will accord best with "factors influencing the needs and developments of local communities." Section 7-11-102, MCA. This was an agreement between the County and Department clearly made pursuant to Title 7, and not Title 18. In every respect the agreement conforms to the requirements of Title 7. As explained, §§ 27-2-202(1), 27-2-211, and 27-2-231, MCA, are inconsistent statutes of limitations which apply to this interlocal agreement. The County is entitled to the benefit of the general rule, as enunciated in *Thiel*, that the longer limitation period should apply. Application of § 18-1-402, MCA,

is inconsistent with the purpose of an interlocal agreement and does not rest on an appropriate characterization by the Court of the County's Complaint.

¶62 I dissent from Issues 1 and 3 of the Court's opinion. Because the County has expressly represented that its action for breach of the implied covenant of good faith and fair dealing sounds in tort, I would conclude they are unable to establish a special relationship with the Department given they are both government entities represented by counsel. I join Justice Shea in his resolution of Issue 3.

/S/ LAURIE McKINNON

Justices James Jeremiah Shea and Ingrid Gustafson join in the dissenting Opinion of Justice Laurie McKinnon.

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON